**SIGNED THIS: February 24, 2025**

_____

**Mary P. Gorman**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No.    23-70583 |
| STEVEN ALLEN WOODRUM, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| FARM CREDIT SERVICES OF | ) | |
| AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No.    23-07036 |
| | ) | |
| STEVEN ALLEN WOODRUM, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

Before the Court after trial is an amended complaint to determine the

dischargeability of debts owed by the Debtor to Farm Credit Services of America,

PCA. For the reasons set forth herein, judgment will be entered in favor of Farm Credit Services of America on a portion of its claims under one of its theories.

## I.      Factual and Procedural Background

Steven Allen Woodrum ("Debtor"), acting pro se, filed a voluntary Chapter 11 Subchapter V petition on July 20, 2023. On the petition, the Debtor reported being engaged in business as a farmer under the name Flying S Farms. When the Debtor failed to file various required documents, the United States Trustee ("UST") filed a motion to dismiss the case. The Debtor thereafter began filing the required schedules and statements, and an attorney filed an application to be employed as counsel for the Debtor. The application was conditioned on the Court approving payment terms that included a $30,000 post-petition retainer. Creditor Prairieland FS, Inc., ("Prairieland") filed an objection to the application, claiming to have a state court citation lien on the funds proposed to be used for payment of the retainer. Proposed counsel countered that the citation had expired under state law, thereby terminating Prairieland's lien.

At a hearing on the motion to dismiss and employment application, the Court noted that it did not have enough information to decide the issues and gave the parties time to gather records from the state court proceedings. After two continued hearing dates, the Court ultimately denied the application to employ citing concerns about overruling a prior state court order. As the Court saw it, an adversary proceeding and full evidentiary hearing would be required to determine the status of Prairieland's citation lien and case law was not

favorable to proposed counsel's suggestion that this Court could reconsider and reverse the order of the state court continuing the citation in full force and effect. Proposed counsel then expressed doubt about seeking employment under different terms and withdrew his appearance.

The UST's motion to dismiss was continued several times while the Debtor progressed with filing required documents before it was ultimately withdrawn. Among the documents filed by the Debtor were schedules of secured and unsecured creditors. Relevant here, the Debtor scheduled Farm Credit Services as an unsecured creditor with a claim of nearly $600,000 that the Debtor marked as contingent, unliquidated, and disputed. Prairieland, the only creditor scheduled as secured, was listed as being owed a disputed $4.5 million partially secured by real estate, farm equipment, and products. The Debtor also filed a Chapter 11 plan of reorganization, which drew several objections. Confirmation of that plan was denied, and the Debtor was given an opportunity to file a first amended plan. Before an amended plan was filed, Prairieland sought and obtained relief from the automatic stay as to the Debtor's residence and his interest in roughly 40 acres of farmland. The Debtor then filed a motion to convert his case to Chapter 7, which was granted.

Prior to the case being converted, Farm Credit Services of America, PCA ("Farm Credit") timely filed a three-count complaint to determine dischargeability of debt. At a pretrial status conference, the Court expressed concern about the viability of one count brought under §523(a)(2)(A) to except from discharge debt obtained by fraud in light of the Supreme Court's decision in *Lamar, Archer &*

*Cofrin, LLP v. Appling*, 584 U.S. 709 (2018). Farm Credit thereafter was granted leave to file an amended complaint to remove the §523(a)(2)(A) count and generally tighten up the allegations of the remaining counts.

The Amended Complaint consisted of two counts. Count I sought a determination that the debts owed to it be excepted from the Debtor's discharge under §523(a)(6) for willful and malicious injury by the Debtor. Count II sought a determination that the debts be excepted from discharge under §523(a)(2)(B) as obtained using false statements in writing respecting the Debtor's financial condition. Both counts were based on the same set of allegations involving two loans made by Farm Credit to the Debtor pursuant to agreements dated January 11, 2018, and February 27, 2019. According to Farm Credit, the loans were obtained using materially false written statements regarding the existence and value of farm equipment that was to secure the debts. Farm Credit further contended that, in creating and delivering the falsified documents upon which Farm Credit relied in extending financing, the Debtor willfully and maliciously injured Farm Credit and its property, namely the loaned funds.

After an unsuccessful motion to dismiss, the Debtor answered the Amended Complaint. The Debtor admitted that he was indebted to Farm Credit under the January 2018 and February 2019 loan agreements, but he disputed the amount of the debts and denied responsibility for the information and documents submitted to Farm Credit in connection with the loans. Instead, he blamed the Prairieland employee that helped him apply for and obtain financing through Farm Credit. The case was tried over two days.

-4-

Farm Credit called Michael Stroup as its first witness. Mr. Stroup identified himself as a longtime finance manager with Prairieland at its Jacksonville, Illinois, location. As finance manager he has served as a point of contact with Prairieland's customers, helping them apply for loans and collecting on past due accounts. It was through his employment with Prairieland that Mr. Stroup came to know the Debtor. Mr. Stroup said that the Debtor had been a customer of Prairieland since around the time Mr. Stroup was promoted to finance manager and assigned to the Morgan County territory more than 20 years prior. He described his relationship with the Debtor as friendly but said that they were not close friends. Mr. Stroup testified that the Debtor was a "sizeable" customer and opined that Prairieland had loaned the Debtor millions over the years and helped him obtain financing from third-party lenders as well.

According to Mr. Stroup, by the end of 2017, the Debtor owed Prairieland more than $3 million, and Prairieland was unwilling to extend further financing. At the same time, the Debtor was in desperate need of money to pay cash rents coming due in early 2018. Mr. Stroup explained that the Debtor did not own most of the land he farmed but rather leased it from various landowners, and his ability to pay cash rents was critical to his operation.

Mr. Stroup identified a selection of text messages sent between himself and the Debtor in December 2017 and January 2018. He acknowledged sending the Debtor a text message on December 13, 2017, expressing concern about getting the Debtor's 2016 debt obligations off Prairieland's books. Although additional financing was not available through Prairieland, Mr. Stroup worked

with the Debtor to find a solution. He acknowledged receiving a text message from the Debtor on December 20, 2017, stating that he "may have a solution," to which Mr. Stroup responded, "Is it legal[?]" The next day, Mr. Stroup received a message from the Debtor: "Knock knock"—a common practice by which the Debtor and other established customers would announce their arrival and ask to be let in through the locked backdoor of the Prairieland Jacksonville office. Later that afternoon, the Debtor sent a text message stating, "Well I've stared and punched the calculator all day and I'm stumped." In response, Mr. Stroup pondered whether the Debtor could "pick two pieces of equip to do AgDirect," to which the Debtor replied, "Doesn't get me close enuff." Mr. Stroup acknowledged sending a text message to the Debtor the morning of December 22, 2017, mentioning that he was submitting his first AgDirect loan application that day and suggesting again that it might be a feasible option for the Debtor. The text conversation from that day concluded with the Debtor telling Mr. Stroup he would get together with him the following week to see if they "could make something work."

On January 4, 2018, Mr. Stroup sent the Debtor a text message asking, "Do you have those papers for me[?]" When the Debtor answered affirmatively, Mr. Stroup responded: "Great! I think we should submit the request." Mr. Stroup acknowledged meeting with the Debtor in his office the following day as indicated by the Debtor texting "Knock knock" shortly after noon on January 5.

Mr. Stroup identified the loan application form he submitted to AgDirect— an assumed name under which Farm Credit does business—on January 5,

2018, on behalf of the Debtor.[1] Mr. Stroup acknowledged his own handwriting on the document, explaining that he completed the form using information provided by the Debtor. He also identified the Debtor's signature on the form, testifying that the Debtor signed the completed form in his presence at his office. Mr. Stroup also said he provided the required applicant disclosure form attached to the application.

The completed application identified four pieces of equipment: a 2018 CIH 2150 planter with serial number YHS074106 and listed value of $240,000, a 2016 CIH 370 Steiger tractor with serial number ZGF308065 and listed value of $225,000, a 2018 CIH RB 565 baler with serial number YHN196682 and listed value of $59,500, and a 2018 CIH DC 102 "disc bine" with serial number YHN263879 and listed value of $39,500.[2] Mr. Stroup acknowledged preparing the loan application without copies of underlying purchase orders for the loan equipment. He said that the Debtor brought in a slip of paper that listed the equipment with serial numbers and other identifying information. He said he copied the equipment information onto the application but did not keep or make a copy of the slip of paper provided by the Debtor. Mr. Stroup testified that he had no reason to believe the information provided was untrue when he prepared the application.

---

[1] Most of the testimony and documentary evidence presented at trial related specifically to AgDirect rather than Farm Credit. For purposes of this Opinion, the two are treated as one and the same and reference to either should be construed as a reference to the other.

[2] This CIH DC 102 "disc bine" is shown as a DC 102 "disc mower" on the security agreement and some of the other documents presented at trial. The discrepancy was never discussed at the trial and is not critical to the decision here; whether described as a "disc bine" or "disc mower," the equipment was listed with the same make, model, and serial numbers. All the evidence supports a finding that the equipment pledged as collateral for the January 2018 loan did not exist. The Debtor never suggested that the equipment existed but was just misdescribed.

Submitted with the loan application was a balance sheet for the Debtor dated December 19, 2017. As with the loan application, Mr. Stroup testified that he prepared the balance sheet using information provided to him by the Debtor. He agreed that, among the equipment listed on the balance sheet as being "100% owned" by the Debtor, was the same equipment—with matching serial numbers and values—described in the loan application. He was not certain but believed that the balance sheet was prepared specifically in support of the loan application. He also could not say exactly when it was prepared but that it must have been at the same time or after the Debtor provided the collateral information for the loan application. Mr. Stroup acknowledged that the Debtor did not sign the balance sheet.

Shortly after the January 5 meeting and submission of the loan application, Mr. Stroup sent a text message to the Debtor: "They are working on it. They requested the purchase orders." Mr. Stroup explained that the message was in reference to Farm Credit reviewing the Debtor's AgDirect loan application and wanting from the Debtor the purchase orders for the equipment listed in the application documents. Mr. Stroup sent a follow up message to the Debtor on the morning of January 8, 2018. He identified the text message which simply stated, "Bill of sale," referring to the request for purchase orders covering the collateral listed on the loan application. He acknowledged that, in response, the Debtor texted that he was going to the equipment dealership and that the dealer "was very funny about it." The Debtor also followed up asking if Mr. Stroup had heard anything more on the loan application. Mr. Stroup texted the Debtor that

he had not heard back on the loan application and that nothing would happen until the requested information was provided. Mr. Stroup agreed that he met with the Debtor in his Prairieland office later that day as indicated by the familiar "Knock knock" text message. Mr. Stroup believed that the Debtor gave him the requested purchase order at that meeting.

Mr. Stroup identified an equipment purchase order from Beard Implement Company dated December 7, 2017, as the one provided by the Debtor in support of the loan application. He testified that he first saw the purchase order when the Debtor provided it to him in his office after the loan application was submitted. The purchase order listed the Debtor as the purchaser of four pieces of equipment with serial numbers and prices matching the information set forth on the loan application and balance sheet for a total cash price of $564,000 with no amount due. Although he assumed the Debtor had given him the original purchase order, he had doubts about the document's authenticity after reviewing it. Specifically, Mr. Stroup explained that the purchase order appeared to have been altered to show a higher purchase price.

Late in the evening of January 8, 2018, Mr. Stroup texted the Debtor to inform him that he had just received an email letting him know the Debtor's application was close to being approved but that the purchase order and proof of payment were still needed. The Debtor responded: "The purchase order shows paid." Mr. Stroup sent a text message to the Debtor a few minutes later asking, "So am I sending the cut and paste one and risking it[?]" The Debtor responded that "[h]is reply was he gave me what I asked for." Mr. Stroup inquired further:

"So there was no other original paperwork that wouldn't be suspicious . . . We don't get a second chance." The conversation ended with a text from the Debtor stating that he would follow up in the morning with whom Mr. Stroup understood to be Kyle Schumacher of Beard Implement, adding that "[Kyle] got kinda pissy when I asked him about it this afternoon."

The next morning, Mr. Stroup received a message from the Debtor stating, "I guess try." Mr. Stroup sought confirmation from the Debtor: "You sure? After looking at it, I'd ask a lot more questions." The Debtor responded: "I'll call you in a few." Despite his concerns about authenticity, Mr. Stroup forwarded the purchase order to Farm Credit on the Debtor's behalf.

Mr. Stroup admitted that he never explicitly told representatives of AgDirect or Farm Credit that he believed the purchase order to include misrepresentations or be "doctored." But he stated that he did raise the issue generally and identified the email, dated January 10, 2018, by which he forwarded the purchase order on the Debtor's behalf to Carla Mickey, a representative of AgDirect and Mr. Stroup's point of contact on the loan application. In that email, Mr. Stroup noted that the Debtor dropped the attached document off, adding that it "[l]ooks to me like they combined or corrected some information on it—not sure why." The email encouraged AgDirect to contact the Debtor directly if it had any questions about the document.

Mr. Stroup acknowledged texting the Debtor the following day—January 10, 2018—asking whether he had received any calls. When the Debtor texted that he had not, Mr. Stroup explained: "Told them to call you if questions on the

doc. They are prob still scratching head." Mr. Stroup testified that he was referring to Farm Credit in his text message to the Debtor and that, at the time, he thought the lender might question the purchase order because it appeared to be cut and pasted or doctored in some way. He said as much in a text to the Debtor at the time, to which the Debtor responded: "I really hope I'm not part of beards cooking books." Mr. Stroup then texted the Debtor that he "would be at risk at this point."

Mr. Stroup conceded that he could have refused to submit the purchase order, adding that he would not have submitted it had he known that the information on it was false. He also acknowledged that he neither reached out to nor spoke with anyone at Beard Implement about the authenticity of the document but said that was not typically a practice that he would follow. He testified that he did not willingly or knowingly participate in whatever was happening with the production of the purchase order and merely submitted what he was given on the Debtor's behalf.

With the purchase order having been provided, the Debtor's loan application was approved. At the time, however, Prairieland held a blanket lien on all the Debtor's property and Farm Credit wanted assurances of its status as priority lienholder. Mr. Stroup identified an AgDirect Chattel Subordination Agreement dated January 10, 2018, and signed by him on behalf of Prairieland. By its terms, Prairieland agreed to subordinate to Farm Credit its security interest in the four pieces of equipment that were to serve as collateral for the

January 2018 loan. He agreed that the Debtor would not have been involved or have even known about the subordination transaction.

Mr. Stroup identified the AgDirect Promissory Note and Loan Agreement between Farm Credit and the Debtor dated January 11, 2018 ("January 2018 loan"). He identified the Debtor's signature on the agreement, explaining that he witnessed the Debtor sign the document in the Prairieland office in Jacksonville on January 11, 2018. Mr. Stroup also identified the corresponding security agreement dated January 11, 2018, as well as the Debtor's signature that he said the Debtor affixed to the document in his presence on that same date. Mr. Stroup agreed that the security agreement identified as collateral for the January 2018 loan four pieces of equipment described by make, model, and serial number, all of which matched the descriptions of the equipment listed on the loan application, purchase order, and balance sheet. He agreed that, despite requesting only $500,000 on the application, Farm Credit ultimately extended $564,000 on the January 2018 loan, an amount equal to the value of the collateral as listed on the application. Mr. Stroup identified the check from AgDirect, dated January 11, 2018, and made payable to the Debtor in the amount of $564,000. He understood the check to be the loan proceeds for the January 2018 loan and surmised that the funds were deposited into the Debtor's bank account and spent on his farming operations.

Mr. Stroup acknowledged seeing a decline in the Debtor's health in early 2019 and reaching out to the Debtor's family out of concerns about who was running his farming operations because rents and bills were coming due and

tasks needed to be done. Mr. Stroup sought another loan through AgDirect on the Debtor's behalf around that time. He said the process for obtaining the second loan was a bit different because the Debtor and Prairieland then had an existing relationship with AgDirect and could apply for loans through a streamlined online portal. Mr. Stroup identified the AgDirect Promissory Note and Loan Agreement between Farm Credit and the Debtor dated February 27, 2019 ("February 2019 loan"). He identified the Debtor's signature on the agreement, explaining that he witnessed the Debtor sign the document in the Prairieland office in Jacksonville. Despite the Debtor's health issues, Mr. Stroup said he had no reason to believe that the Debtor was impaired when he signed the loan documents.

Mr. Stroup said that the purpose of the second loan was to refinance some equipment unrelated to the first loan, namely two shredders, three tractors, and a fuel trailer. More specifically, the loan was what he described as a "cash out refi"—meaning the loan proceeds were used to pay off an existing debt secured by the property with the surplus going to the Debtor. He identified a chain of emails between himself and Joni Stewart, an AgDirect representative, that included a payoff letter from Mr. Stroup for a debt on Prairieland's books owed by the Debtor. According to Mr. Stroup, the February 2019 loan was used to pay off some of the Debtor's debts to Prairieland. He said Prairieland carved out a portion of the Debtor's existing operating loans to be paid off with a new AgDirect loan in exchange for subordination of Prairieland's security interest in several pieces of equipment over which Farm Credit was to receive a first priority lien.

The email exchange with Ms. Stewart referenced amounts paid or payable to complete the loan transaction. Mr. Stroup explained that the downpayment for the February 2019 loan was made in the form of the Debtor's equity in a trailer valued at $22,225. Even with the equity downpayment, the value of the collateral given for the second loan fell short of the required loan-to-value ratio, and a payment of $2838 from the Debtor to AgDirect was needed to complete the loan transaction and clear the debt from Prairieland's books. Asked whether the Debtor signed a loan agreement for the Prairieland debt that was paid off by the February 2019 loan, Mr. Stroup said the debt would have fallen under the future advance clause of the master agreement signed by the Debtor years prior.

Mr. Stroup also identified the corresponding security agreement dated February 27, 2019, as well as the Debtor's signature that he said the Debtor affixed to the document in his presence at the Prairieland office on that date. Mr. Stroup agreed that, unlike the January 2018 loan, the collateral for the February 2019 loan did exist, and he said that all but one piece of collateral had been repossessed by Prairieland and was eventually recovered by Farm Credit. He also acknowledged that the security agreement contained a cross-collateralization clause and had no reason to doubt that Farm Credit would not have entered into the second loan agreement had it known that the collateral for the first loan did not exist.

Mr. Stroup described the process he would generally follow when having a customer review and sign documents, which admittedly varied with the circumstances. When third-party lenders like AgDirect were involved, the

process would typically be more involved than for in-house loans because those third-party lenders would have their own review process that Mr. Stroup would have to follow. He said he had a specific recollection of reviewing the documents for the January 2018 loan with the Debtor because it was only the second loan that Prairieland had done through AgDirect and he was careful to follow the review checklist exactly as written. While he admittedly did not remember every occasion that the Debtor signed a document in his presence over the years, he said they all would have been signed in his presence or in the presence of a notary. He also said that, although the Debtor did not sign or initial every page of the loan and security agreements with Farm Credit—and particularly the pages listing the collateral—he would not have collected the Debtor's signature on the final pages of the documents without providing all other pages. He denied ever providing the Debtor with blank loan documents to sign.

On cross examination, Mr. Stroup was asked about Prairieland's relationship with Farm Credit. To the best of his knowledge, Farm Credit typically provided purchase money financing through equipment dealerships. He said that he reached out several times trying to establish a relationship with Farm Credit via AgDirect and that the January 2018 loan was part of a trial run in furtherance of the goal of becoming an authorized merchant or dealer able to issue loans directly through AgDirect. Mr. Stroup said he did not receive compensation for the January 2018 loan, but he acknowledged being compensated for the February 2019 loan. He said that Prairieland worked with

Farm Credit on several more loans through AgDirect but that the relationship

had paused pending the litigation stemming from the loans issued to the Debtor.

The next witness called by Farm Credit was Kyle Schumacher. Mr.

Schumacher testified that he is part owner and president of Beard Implement

Company. He explained that he oversees operations of the business, which sells

farm machinery, and sometimes personally makes sales for the company. He

said the company operates out of multiple dealership locations and carries

various brands of equipment, including Case IH. The company offers financing

on the equipment it sells, through either the manufacturer or purchase money

lenders. Mr. Schumacher said that he had known the Debtor for several years

dating back to the time he began working at Beard Implement.

Mr. Schumacher identified a collection of documents that Beard

Implement produced in response to a subpoena relating to the company's

dealings with the Debtor. Among them, was a purchase order dated September

14, 2017, for certain equipment sold to the Debtor, including a 2015 CIH 370

Steiger. He confirmed that Beard sold the listed equipment to the Debtor as

reflected on the purchase order. He also identified several lease agreements

entered into with the Debtor in December 2017 covering a CIH RB 565, a CIH

DC 102, a CIH 2150, and another CIH 370 Steiger. He confirmed that each item

listed in the agreements was in fact leased to the Debtor.

Next, Mr. Schumacher identified the December 7, 2017, purchase order

that was provided to Farm Credit in connection with the Debtor's AgDirect loan

application. He recognized it as a Beard Implement form and acknowledged that

it appeared to bear his signature. But he denied signing a purchase order with the information shown and said that Beard did not sell the equipment listed to the Debtor. Mr. Schumacher said that he personally searched for the equipment by serial number in Beard's system and found that no equipment with those serial numbers existed. He agreed that the Debtor had, at different times, leased or purchased from Beard equipment of the same make and models as those listed on the purchase order albeit with different serial numbers. Mr. Schumacher further explained that he did not know where the December 2017 purchase order had come from, only that it was not one prepared by him or his company.

Mr. Schumacher said that he understood the Debtor to have a copy of a blank Beard purchase order form and identified a group of text messages between himself and the Debtor showing that he sent a blank form to the Debtor on September 14, 2017. Included in the text messages was an image of a blank form sent by the Debtor with a message stating that "[i]t was blank" in response to a message from Mr. Schumacher telling the Debtor to check his email. Mr. Schumacher also said that the Debtor would have had copies of actual purchase orders and agreements for equipment he previously purchased or leased from Beard.

On cross examination, Mr. Schumacher agreed that he had a good working relationship with the Debtor as one of Beard's larger customers over many years. As with many of Beard's larger customers, Mr. Schumacher said that he frequently personally dealt with the Debtor. Prior to the Debtor's financial and legal troubles, Mr. Schumacher said he never had any issues with the Debtor.

Mr. Schumacher agreed that the signature on the December 2017 purchase order looked like his but also said that he often used his typed name or initials in place of a physical signature on purchase orders. As to whether the blank purchase order sent to the Debtor included his signature, Mr. Schumacher could not say because the bottom of the document was cut off in the text image.

Asked whether he had ever met with Prairieland representatives regarding the September 14, 2017, purchase order, Mr. Schumacher could not recall. He said that he did meet with Michael Stroup at Prairieland's Jacksonville office one time but could not recall the specifics of that meeting or what other communication he might have had with Mr. Stroup via text message. He acknowledged ultimately recovering equipment leased to the Debtor and repossessed by Prairieland but emphasized that those pieces of equipment had serial numbers different from the nonexistent equipment.

Tracie Archer was also called as a witness in Farm Credit's case in chief. She testified that she is a corporate representative of Farm Credit, which does business as AgDirect. Ms. Archer began her career with Farm Credit as a resolution officer, acting as the initial contact with customers when accounts became past due. After one year she was promoted to her current position of litigation officer, which she has held for the last 13 years. As a litigation officer, Ms. Archer manages past due accounts that the resolution officers are unable to resolve and monitors accounts that have reached the litigation stage, including bankruptcy and foreclosure proceedings.

Ms. Archer said she was familiar with the Debtor's file, which came to her after the default could not be resolved and it became necessary to retain counsel to pursue the collateral and to represent Farm Credit in the Debtor's bankruptcy. Through her employment and in preparation as a witness in this proceeding, Ms. Archer said she had reviewed the entire file and could testify to the account history and the actions taken by Farm Credit with respect to the Debtor. To that end, Ms. Archer said she was familiar with the Amended Complaint, which she reviewed prior to filing, and testified that the allegations therein were true and accurate to the best of her knowledge. She also identified a state court complaint filed against the Debtor that included her signed verification as to the truth and accuracy of the allegations made therein. Ms. Archer also reviewed and verified the accuracy of Farm Credit's proof of claim filed in the Debtor's bankruptcy. She acknowledged that the total claim amount as of the date of the Debtor's bankruptcy was $778,396.34, of which $674,155.70 was attributed to unpaid principal, interest, late fees, and attorneys' fees on the January 2018 loan, and $104,240.64 was attributed to unpaid principal, interest, late fees, and attorneys' fees on the February 2019 loan.

Ms. Archer identified the loan application submitted on the Debtor's behalf for the January 2018 loan and testified that Farm Credit relied on the truthfulness of the information therein when it approved the Debtor for a loan and extended financing through AgDirect. Ms. Archer also identified the Beard purchase order dated December 7, 2017, that was submitted to Farm Credit in response to its request for purchase orders in support of the loan application.

She said that Farm Credit relied on the truthfulness of the information in the purchase order in determining whether to approve and make the loan to the Debtor. Likewise, Ms. Archer identified the balance sheet submitted in connection with the Debtor's loan application and said that Farm Credit relied on the truthfulness of its contents in approving the Debtor for financing. Next, Ms. Archer identified the January 2018 loan and security agreements under which Farm Credit through AgDirect loaned the Debtor $564,000 in exchange for his promise to repay and a security interest in four pieces of equipment described in the security agreement with serial numbers matching those listed on the loan application, balance sheet, and purchase order. She said that Farm Credit relied on the existence of the collateral in entering into the January 2018 loan agreement.

Ms. Archer next identified the subordination agreement with Prairieland dated January 10, 2018. She explained that the purpose of the agreement was to ensure that Farm Credit held a first priority security interest in the four pieces of collateral pledged for the January 2018 loan. She confirmed that the equipment listed in the subordination agreement matched that listed in the security agreement. Ms. Archer also identified a UCC financing statement regarding the collateral pledged for the January 2018 loan. She confirmed that the financing statement, which was marked as having been received by the Illinois Secretary of State on January 11, 2018, listed four pieces of equipment with serial numbers matching those listed on the Debtor's loan application and the January 2018 security agreement. Ms. Archer testified that Farm Credit

believed it had a perfected security interest in the collateral described when it caused AgDirect to issue a check on January 11, 2018, made payable to the Debtor in the amount of $564,000.

Ms. Archer said that the Debtor made only one payment under the January 2018 loan agreement before defaulting on a second loan. She identified that second loan as the February 2019 loan under which an additional $184,662 was extended. Ms. Arched testified that, for the February 2019 loan, the Debtor pledged six additional pieces of equipment under a contemporaneously executed security agreement. She said the Debtor failed to make any payments on the February 2019 loan, triggering a default on that loan as well as the cross-collateralized January 2018 loan. She said Farm Credit never would have made the February 2019 loan had it known that the collateral pledged for the January 2018 loan did not exist.

After the notice of default was issued, Farm Credit began the process to recover its collateral. Ms. Archer said that a recovery team for Farm Credit reached out to Beard Implement for information it might have as the original dealer. She said that Farm Credit was unable to locate the collateral for the January 2018 loan; Beard Implement never sold the equipment to the Debtor.

On cross-examination, Ms. Archer agreed that Farm Credit typically does not lend directly to consumers but goes through vendors who work with borrowers. She explained that Farm Credit would generally build relationships with vendors and enter into "merchant agreements" that would outline Farm Credit's requirements and expectations for the loan application process. She said

that vendors are often dealers of goods or equipment but that other lenders or financial institutions are also among Farm Credit's vendors. She acknowledged that Prairieland's status as a vendor had been suspended due to the litigation surrounding the Debtor's loan transactions.

Ms. Archer did not dispute that everything submitted on the Debtor's behalf came through Michael Stroup. She identified emails sent between Mr. Stroup and AgDirect representative Joni Stewart regarding the February 2019 loan. She agreed that those emails called for the Debtor to pay $2838 to close on the agreement, the purpose of which she believed was to make up a shortage between the amount Farm Credit was willing to loan and the amount of Prairieland debt that was to be paid off and replaced by the February 2019 loan. She did not dispute that the Debtor had no apparent involvement in the email discussion or that all proceeds for the February 2019 loan went to Prairieland.

Finally, after testifying as an adverse witness in Farm Credit's case in chief, the Debtor testified in his own defense.[3] He said that he had farmed all his life but began farming in earnest with his grandfather in 1999. Operating as a sole proprietor under the name Flying S Farms, the Debtor testified that he farmed approximately 6500 acres at the peak of his operation. He farmed everything from cattle to hay but said that he focused mostly on soybeans and corn. The Debtor acknowledged that less than 40 acres of the land he farmed was his own and that the vast majority was farmed on a cash rent basis. He said that the

---

[3] For clarity and organizational purposes, his testimony as an adverse witness is discussed with his defense testimony here.

terms and payment schedules of the leases varied among as many as 30 landlords. To meet the obligations of operating at the scale he was, the Debtor relied on the availability of credit. He said that, over the years, he worked almost exclusively with Prairieland and Mr. Stroup for his borrowing needs and put a great deal of trust in them.

By the end of 2017, pressure was mounting over repayment of outstanding debts to Prairieland, and some of his cash rents were coming due in early 2018. The Debtor acknowledged not having liquid funds at the time to satisfy those obligations. He identified the selection of text messages between himself and Mr. Stroup in December 2017 and January 2018 and said he was familiar with them. The Debtor acknowledged his participation in the text conversations trying to find a solution to his financing needs. The Debtor agreed that he and Mr. Stroup eventually decided to apply for a loan through AgDirect after Mr. Stroup successfully completed the process for the first time on behalf of another customer. The Debtor did not dispute that he then met with Mr. Stroup in his office on January 5, 2018, and said he understood that Mr. Stroup would be submitting an AgDirect loan application on his behalf.

When presented with the completed loan application form that was submitted to Farm Credit, however, the Debtor disclaimed any participation, knowledge, or responsibility for the document. Noting that the loan application was completed by Mr. Stroup, the Debtor claimed not to have supplied the information included on the form; he surmised it was information Mr. Stroup already had from the Debtor's prior dealings with Prairieland. As to the four

pieces of equipment listed, the Debtor agreed that he never owned or leased any of the items. And although he admitted he signed a loan application form, he refused to admit that the signature on the completed form was his. He believed the document he signed was blank, asserting that to be common practice for him in his dealings with Mr. Stroup and Prairieland and adding that he was always running late and was a bit scatter-brained.

The Debtor identified the December 2017 balance sheet that Mr. Stroup testified to preparing on his behalf. The Debtor did not dispute that Mr. Stroup prepared the document or that the collateral the Debtor testified he never owned was listed on the balance sheet as equipment owned by him. He agreed that the model numbers, serial numbers, and values of those four pieces of equipment all matched the information on the loan application and that the information on the balance sheet was likewise false. Still, the Debtor denied any knowledge that this false information was being supplied to AgDirect or Farm Credit.

The Debtor was also questioned about the Beard Implement purchase order dated December 7, 2017. Asked whether he signed the document, the Debtor said he did not believe he signed a "fake purchase order." Pressed further on the document's authenticity, the Debtor said he never disputed the document was illegitimate and again conceded that he had not purchased the four pieces of equipment with the serial numbers listed and therefore also did not pay Beard Implement $564,000 in cash for such equipment on December 7, 2017, or any other date. The Debtor denied having any knowledge of where the document had come from other than that he did not prepare it and did not provide it to Mr.

Stroup or Farm Credit. He speculated that someone at Prairieland took his signature from another document and affixed it to the fake purchase order.

Despite his claims of ignorance, the Debtor acknowledged participating in the text exchange with Mr. Stroup about the status of the AgDirect loan application in the days following their January 5 meeting in the Prairieland office. He agreed that Mr. Stroup informed him that the lender was "working on it" and had "requested the purchase orders." The Debtor said he understood the message to mean Farm Credit had reviewed his loan application and wanted supporting purchase orders from Beard Implement. In response to Mr. Stroup's message, the Debtor texted, "Ok I'll grab them." When asked what purchase orders he was going to get from Beard, however, the Debtor said he did not entirely understand but thought he needed purchase orders showing equipment trade-ins and lease buyouts that created surplus equity to borrow against.

The Debtor identified and acknowledged text messages exchanged with Mr. Stroup over the next several days. He admitted that the focus of those conversations was the requested purchase order, and that the messages suggested that he would and did obtain a purchase order from Beard Implement and deliver it to Mr. Stroup on or about January 8, 2018. He also admitted that Mr. Stroup had raised concerns about the provided purchase order being "cut and paste" or "doctored" and questioned whether it should be submitted to Farm Credit. The Debtor acknowledged his text in response to Mr. Stroup's inquiring stating, "I guess try." At first, the Debtor testified that he was telling Mr. Stroup to send certain unidentified purchase orders other than the December 2017

purchase order for nonexistent equipment. When pressed about his message in the context of the text exchange leading up to it, the Debtor admitted that he was telling Mr. Stroup to send the purchase order that looked "cut and paste" but continued to disclaim any understanding of what was happening. He acknowledged sending a message later regarding to the "doctored" purchase order that said, "I really hope I'm not part of beards cooking books."

The Debtor admitted that he had a blank, unsigned purchase order for Beard Implement in his possession. He also had copies of executed purchase orders and lease agreements for equipment he had previously bought or leased from Beard. He acknowledged having previously bought a CIH STG 370 with serial number ZFF304814 for $207,000 from Beard, evidenced by the purchase order dated September 14, 2017. He also acknowledged leasing two other CIH STG 370 models from Beard, one with serial number ZEF301585 and evidenced by a lease agreement dated March 13, 2017, and another with serial number ZGF309075 and evidenced by a lease agreement dated December 16, 2017. The Debtor agreed that none of the serial numbers matched those listed for the CIH Steiger 370 on the fake December 2017 purchase order. The Debtor likewise acknowledged having leased a CIH RB 565 with serial number YHN195682 and a CIH DC 102 with serial number YHN263279 from Beard, as evidenced by the lease agreement dated December 28, 2017. The Debtor also agreed that neither of the serial numbers matched those listed for the same models on the fake purchase order and did not dispute that the serial numbers for the DC 102 differed only by one digit. Finally, the Debtor acknowledged entering into a lease

-26-

agreement with Beard dated December 16, 2017, for a CIH 2150 with serial number YHS073116, which differed from the serial number listed for the same model on the fake purchase order. He denied changing the serial numbers for the leased equipment to create the fake purchase order given to Farm Credit.

Presented with the January 2018 loan agreement bearing his purported signature, the Debtor said he did not know whether he signed it but agreed that he knew he had a loan and made the first installment payment called for in the agreement. He acknowledged that the loan agreement also contained a cross-collateralization clause and provided for payment of legal fees. He also acknowledged the bolded provision above the signature line telling the endorser to read the agreement carefully before signing. But when asked whether the signature following the bolded provision looked like his, the Debtor said that a letter from his middle name appeared to be missing and that he had reason to believe his signature was forged by someone at Prairieland.

Turning to the security agreement for the January 2018 loan, the Debtor said it was hard to say whether he signed the document. He said he could have signed some piece of paper but did not recall signing a document in the form shown to him at trial. The Debtor did agree that the equipment listed as collateral in the security agreement did not exist and that he never purchased those items. He acknowledged provisions within the security agreement regarding the possession and condition of the collateral, as well as one in all capital letters directly above the signature line stating that the endorser had read and received a copy of the agreement before signing. He agreed that his name was correctly

spelled and that the signature appeared to be genuine; he ultimately conceded that it was more likely than not his signature.

As to what the Debtor thought he was pledging as collateral for the January 2018 loan of $564,000, the Debtor's testimony was unclear. He mentioned discussions of stripping equity out of existing equipment he had pledged as collateral for other loans but did not give specifics. When pressed for details, the Debtor first said he was never sure what was happening but then said he thought that he was pledging a large combine as collateral. He claimed he was ignorant of financial matters and relied on Mr. Stroup to handle his finances and figure everything out for him.

The Debtor identified the AgDirect check dated January 11, 2018, and made payable to him in the amount of $564,000. He acknowledged signing the check, depositing the funds into his account with Farmers State Bank and Trust, and ultimately spending the funds on cash rents and other expenditures related to his farming operation. He agreed that, without the funds from Farm Credit, he would not have been able to make his January 2018 cash rent payments.

The Debtor identified the February 2019 loan agreement he entered into with Farm Credit. He did not dispute that the signature on the last page of the agreement was his, but he denied that the complete agreement was presented to him at the time he executed the signature page. Asked why he would sign a paper that said it was "Page 5 of 5" without the first four pages, the Debtor said that was his standard practice with Mr. Stroup and Prairieland and that he did not generally read what he was signing. The Debtor also identified the corresponding

security agreement dated February 27, 2019. He testified that he could not be certain that the signature on the last page of the document was his but that he assumed he signed it. Again, he claimed that Mr. Stroup presented the signature page to him for execution without the preceding pages. The Debtor agreed that, unlike the security agreement for the January 2018 loan, the February 2019 security agreement listed collateral that in fact existed and was ultimately recovered by lienholders. He also acknowledged receiving $187,500 from Prairieland on March 4, 2019.

Under questioning from Farm Credit's attorney, the Debtor agreed that false statements were made in obtaining the January 2018 loan. But he continued to disclaim any knowledge of the representations made on his behalf in connection with either loan. He denied reading or even receiving complete copies of documents that he signed and disclaimed any personal responsibility for the representations made therein. The Debtor testified that he was always busy, disorganized, and probably stretched too thin, and that he was distracted by several health and medical issues that often left him in a state of confusion. His attempt to offer previously undisclosed medical records as evidence was denied by the Court.[4]

As to who was responsible for the false statements made on his behalf, the Debtor pointed to Mr. Stroup and Prairieland, accusing them of engaging in

---

[4] The Court's standard trial order, which was entered in this case, plainly requires parties to identify and docket all exhibits in advance of trial. The requirements of the trial order are strictly enforced. The Debtor failed to include the medical evidence among the exhibits he identified and docketed as required by the Trial Order, and he was therefore barred from offering the new evidence at trial. The Court also noted that evidence of the Debtor's medical problems or health history would generally require an expert witness.

questionable lending practices, schemes to defraud their own customers and third-party lenders for profit, and other alleged misconduct.[5] The Debtor reiterated that he was not involved in the preparation and submission of the loan application and claimed that Mr. Stroup had ulterior motives in making the January 2018 loan happen. He questioned why he would create a fake purchase order for one loan only to turn around and provide a legitimate purchase order for the second loan.

His accusations against others notwithstanding, the Debtor admitted that he signed an affidavit in connection with the state court litigation on December 11, 2020, which included the following statement:

> 4.   To the best of my knowledge, the following equipment is in possession of Beard Implement in Ashland, Illinois:
>
> a.  2018 Case IH 2150 Planter, Serial No. YHS074106;
>
> b.  2016 Case IH 370 Steiger Tractor, Serial No. ZGF308065;
>
> c.  2018 Case IH RB565 Round Baler, Serial No. YHN196682; and
>
> d.  2018 Case IH DC102 Disc Mower, Serial No. YHN263879.

Despite attesting to the statement under penalty of perjury by signing the affidavit, the Debtor denied representing that the collateral in fact existed. Rather, the Debtor claimed that he was representing that equipment of the stated make and models were in Beard's possession and that, after signing the affidavit,

---

[5] The Debtor attempted to offer, through his own testimony, the contents of a report by Steve McKasson, a purported handwriting expert who examined and compared handwriting samples of the Debtor to certain documents the Debtor said were forged by Prairieland. The Court sustained Farm Credit's objection to the evidence, explaining to the Debtor that he should have called Mr. McKasson as a witness so that he could have testified as to his report and findings and been subject to cross-examination by Farm Credit.

he clarified that the serial numbers were incorrect. He ascribed the issue to his practice of not reading documents before signing them.

At the close of evidence, the parties argued their respective positions. The matter is ready for decision.

## II.    Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). The determination of the dischargeability of a particular debt is a core proceeding. 28 U.S.C. §157(b)(2)(I). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III.    Legal Analysis

Farm Credit asserts that the debts owed to it by the Debtor on two separate loans should be excepted from the Debtor's discharge for two reasons: (1) because the debts were for loans obtained by use of statements in writing that were materially false, respecting the Debtor's financial condition, and reasonably relied on by Farm Credit; and (2) because the debts were incurred due to willful and malicious injury caused by the Debtor to Farm Credit's property.

### A. Section 523(a)(2)(B)

Taking the causes of action of the Amended Complaint in reverse order, Count II seeks a determination that the debts owed to Farm Credit based on loan agreements dated January 11, 2018, and February 27, 2019, be excepted from discharge under §523(a)(2)(B) as ones obtained by the use of false statements in writing respecting the Debtor's financial condition, namely misrepresentations in the Debtor's loan application and supporting balance sheet and purchase order regarding his ownership of certain equipment that was being offered as collateral.

Section 523(a)(2)(B) provides that an individual debtor is not discharged from any debt obtained by:

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. §523(a)(2)(B). Because exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor, Farm Credit, as the plaintiff, bears the burden of establishing each element of the exception by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290 (1991); *In re Cohen*, 507 F.3d 610, 613 (7th Cir. 2007). Because Farm Credit challenges

the dischargeability of debts arising from two loan transactions, each must be separately analyzed.

### i.      The January 2018 Loan

1. <u>Statements in Writing Respecting Debtor's Financial Condition</u>

Threshold issues under §523(a)(2)(B) are that the statements at issue be in writing and respecting the debtor's financial condition. Here, Farm Credit's claim is based on the Debtor's false statements that equipment had been purchased and was owned by him on the loan application, balance sheet, and purchase order submitted in connection with the January 2018 loan.

The statements made in the loan application, balance sheet, and purchase order were in writing. At trial, the Debtor denied preparing the documents and equivocated about whether he signed the documents or, if he did sign them, whether he signed them as prepared. But there is no requirement that a debtor have prepared or signed the writing to be charged with the statements therein so long as he uses, adopts, or affirms the writing in some way. *Colchester State Bank v. Phillips (In re Phillips)*, 367 B.R. 637, 643 (Bankr. C.D. Ill. 2007) (Perkins, J.) (citations omitted); *see also Webster Bank v. Contos (In re Contos)*, 417 B.R 557, 563 (Bankr. N.D. Ill. 2009). Here, the Debtor adopted the written statements when he caused them to be submitted to Farm Credit and again when he entered into the January 2018 loan agreement. To be sure, he denied any knowledge of the statements made in the documents. The Debtor's knowledge about the statements is fully addressed below in the context of the intent element, but it is

clear that the Debtor knew he needed asset equity to offer as collateral and that documentation of such equity was required before his loan application would be approved. The Debtor admitted that he authorized Mr. Stroup to submit the documents on his behalf. He affirmatively texted Mr. Stroup telling him to proceed with submitting the Beard purchase order to Farm Credit even after Mr. Stroup raised questions about its authenticity.

Further, the statements were ones respecting the Debtor's financial condition. The Supreme Court has held that, consistent with its ordinary meaning, the word "respecting" should be read expansively and that "a statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status." *Appling*, 584 U.S. at 716-20. Because "a single asset has a direct relation to and impact on aggregate financial condition," a statement about the existence or value of an individual asset "bears on a debtor's overall financial condition" and therefore can be a "statement respecting" said condition. *Id.* at 720. Based on *Appling*, the statements in the loan application, balance sheet, and purchase order about the existence, ownership, and value of equipment that was to serve as collateral for the January 2018 loan were statements respecting the Debtor's financial condition.

### 2. Material Falsity of the Statements

It is not disputed that the equipment listed as the Debtor's in the loan application, balance sheet, and purchase order did not exist and was therefore never owned by the Debtor. The Debtor acknowledged in his testimony that the

Beard Implement purchase order dated December 7, 2017, was "fake" and that
he never owned a CIH DC 102 with serial number YHN263879, an RB565 with
serial number YHN196682, a CIH STEIGER 370 with serial number ZGF308065,
or a CIH 2150 with serial number YHS074106. The Debtor agreed that the same
items of equipment with corresponding serial numbers and values were listed as
being "100% owned" by him on the December 2017 balance sheet prepared on
his behalf and that the information on the balance sheet was therefore false. The
Debtor also identified the loan application listing the same equipment which he
agreed he never leased or purchased. Without question, the representations
about the existence and the Debtor's ownership of the equipment in the purchase
order, balance sheet, and loan application were false statements.

The false statements were also material. There are two tests for
determining whether a false statement is material; the Seventh Circuit has
recognized both but has not decided whether one must be applied over the other.
*Contos*, 417 B.R. at 564 (citing *Selfreliance Fed. Credit Union v. Harasymiw (In re
Harasymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990), and *In re Bogstad*, 779 F.2d
370, 375 (7th Cir. 1985)). Under the "substantial untruth" test, a false statement
is material if it "paints a substantially untruthful picture of a financial condition
by misrepresenting information of the type which would normally affect the
decision to grant credit." *Id.* (citation omitted). The alternative "but for" test
requires proof "that 'but for' the material misrepresentations, [the creditor] would
not have extended money, property, services, or credit." *Id.* (citations omitted).

-35-

Here, the loan application sought to refinance four pieces of equipment purportedly owned and purchased by the Debtor for $564,000. Approval of the application was subject to proof of purchase being provided to the lender and was withheld until such proof was provided. The December 2017 purchase order that was ultimately submitted showed a total cash purchase price of $564,000 for four pieces of equipment with serial numbers and prices for each that matched the listings on the loan application and the December 2017 balance sheet submitted with the loan application. Although the loan application only sought $500,000, the Debtor was approved for and accepted loan proceeds of $564,000 under the January 2018 loan agreement. Tracie Archer testified that Farm Credit would not have made the loan to the Debtor without obtaining a security interest in the equipment. Her testimony was bolstered by the fact that, one day before entering into the January 2018 loan agreement with the Debtor, Prairieland executed a subordination agreement under which it subordinated any interest it had in the equipment in favor of Farm Credit as part of the latter's effort to ensure its loan to the Debtor was fully secured.

The unrebutted evidence established that Farm Credit would not have extended $564,000 under the first loan agreement but for the representations that the Debtor owned property with sufficient equity to fully secure the debt. And those false statements are clearly of the type and magnitude that would affect any lender's decision to grant credit. Under either test, the Debtor's false statements were material.

### 3. Farm Credit's Reliance on the Statements

Ms. Archer's unrebutted testimony was that Farm Credit relied on the truthfulness of the Debtor's loan application, balance sheet, and purchase order in approving and making the January 2018 loan to the Debtor. She said that Farm Credit would not have approved the Debtor's loan application and would not have entered into the January 2018 loan agreement with the Debtor had it known that the listed equipment—which was specifically identified as collateral for the loan in the contemporaneously executed security agreement—did not exist. Her testimony was bolstered by other evidence showing Farm Credit's insistence on the purchase order for the equipment being provided before it would process the Debtor's loan application. The Debtor conceded he had no reason to dispute that Farm Credit relied on information provided in the loan application, balance sheet, and purchase order. Together this evidence established that Farm Credit in fact relied on the statements made in the loan application, balance sheet, and purchase order. But actual reliance is not enough; Farm Credit must also establish that its reliance was reasonable. *Busey Bank v. Cosman (In re Cosman)*, 616 B.R. 358, 369 (Bankr. N.D. Ill. 2020) (citation omitted).

The reasonableness of a creditor's reliance is determined on a case-by-case basis, but "courts should not use the reasonable reliance requirement to second-guess a creditor's decision to lend money." *Contos*, 417 B.R. at 566 (citing *In re Morris*, 223 F.3d 548, 553 (7th Cir. 2000), and *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1989)). Here, Farm Credit's insistence on proof of purchase of the

equipment before determining whether to make the January 2018 loan supports a finding that its reliance was reasonable.

Michael Stroup's testimony suggested that Farm Credit had notice of potential issues with the purchase order that was submitted. He identified the email he sent to an AgDirect representative on January 10, 2018, by which he submitted the requested purchase order along with a note that it "[l]ooks to me like they combined or corrected some information on it—not sure why." But insofar as Mr. Stroup's email called attention to irregularities in the purchase order, by the same token, it offered a justification for those irregularities to allay potential concerns. Mr. Stroup's text messages with the Debtor at the time and his trial testimony describing the purchase order as "doctored" showed that he had real concerns about the authenticity of the Beard purchase order. But he did not share those concerns with representatives of AgDirect or Farm Credit in any meaningful way; the comments he made in the email were not enough to alert Farm Credit that the purchase order may have been falsified or that the equipment did not exist. *Cosman*, 616 B.R. at 370-71 (creditors not required to review and verify each representation with incredulity and are generally entitled to rely on representations made unless it would be so unreasonable as not to be actual reliance at all) (citing *Morris*, 223 F.3d at 553, and *In re Garman*, 643 F.2d 1252, 1259-60 (7th Cir. 1980)) (other citations omitted).

Farm Credit relied on the loan application, balance sheet, and purchase order in loaning the Debtor $564,000 under the January 2018 loan agreement, and that reliance was reasonable.

4. <u>The Debtor's Intent</u>

A debt obtained through use of false statements in writing, respecting the debtor's financial condition, and upon which the creditor relied will only be excepted from discharge if the debtor "caused [them] to be made or published with intent to deceive[.]" 11 U.S.C. §523(a)(2)(B)(iv). Proof of intent to deceive can be established in different ways. It may be proven through direct evidence. *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995). It may "logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan." *Id.* (citations omitted). "A debtor's intent to deceive may also be demonstrated by showing reckless indifference to, or reckless disregard for, the accuracy of the information" presented in supporting documents submitted as part of a loan request or in the loan documents themselves. *Contos*, 417 B.R. at 565 (citation omitted). "Whether to infer the requisite intent is left to the bankruptcy court that presides over the case." *Sheridan*, 57 F.3d at 634.

The Debtor admitted that false statements were made in the loan application, balance sheet, and purchase order regarding the existence and his ownership of equipment that was to serve as collateral for the January 2018 loan. However, he denied preparing those documents and denied supplying the information or having any knowledge of the misrepresentations made in the documents. He further denied reading or even having the opportunity to review documents prior to signing them or their being submitted to Farm Credit. The Debtor's denials were simply not credible.

True, Michael Stroup prepared the loan application and balance sheet on the Debtor's behalf. But text messages between the two showed that the Debtor was very much involved in the decision to apply for a loan through AgDirect and in the application process, as well as discussions about what was needed to qualify for financing. Early in the discussions, the Debtor was dismissive of Mr. Stroup's suggestion that he "pick two pieces of equipment to do AgDirect," texting in response that it "[d]oesn't get me close enuff." When he later decided to pursue financing through AgDirect, the Debtor was clearly aware that approval of his loan application was contingent on him providing proof of purchase for the equipment that was to be pledged as collateral; he was tasked with obtaining relevant purchase orders from Beard Implement and forwarding them to Mr. Stroup. The Debtor ultimately produced a single purchase order that he directed Mr. Stroup to submit to the lender notwithstanding Mr. Stroup's stated concerns about the document appearing to have been "doctored."

The Debtor suggested that he may have been a pawn in some unexplained scheme by Kyle Schumacher and Michael Stroup, but that suggestion was not supported by the evidence. Mr. Schumacher credibly testified that he did not prepare the purchase order, never sold the specific equipment listed to the Debtor, and that Beard had no record of the equipment existing in its inventory to even have been available for sale. It strains credulity to believe that someone with no apparent motive would risk exposure for himself and his company by preparing a fake purchase order for made-up equipment that against all odds happened to match equipment listed in the loan application and balance sheet

separately prepared and previously submitted for a loan in which he had no interest. Likewise, the text messages between the Debtor and Mr. Stroup strongly suggested that Mr. Stroup did not prepare the fake purchase order; the messages showed that the Debtor produced a questionable purchase order that Mr. Stroup, in turn, gave to Farm Credit. If there was a scheme involving Mr. Stroup—and there may well have been—the Debtor was certainly an active participant. Add to that the Debtor's knowledge of how similar equipment was listed on purchase orders through past transactions with Beard and his admission that he had a blank Beard purchase order form in his possession at the time, the obvious conclusion to draw is that the Debtor created a fake purchase order showing the purchase of equipment he never owned.

But even if the Court were to believe the Debtor's claims that he did not prepare the fake purchase order, had no knowledge of its contents, and was otherwise unaware of what equipment was listed in the loan application and other loan documents, it would not be enough to preclude a finding of intent to deceive. At a minimum, the Debtor showed reckless indifference to, or reckless disregard for, the accuracy of the information presented in his loan application, supporting balance sheet and purchase order, as well as the loan documents. His claimed ignorance of financial matters notwithstanding, the Debtor owned and operated a sizeable farming operation for many years and had significant experience working with lenders and obtaining financing to sustain his business. The text messages between Mr. Stroup and the Debtor showed a general awareness of the information needed to qualify for loans. The evidence also

established that the Debtor was desperate for financing when he applied for the January 2018 loan. Even if the Debtor never reviewed the loan application, balance sheet, purchase order, or loan and security agreements—whether because he chose not to read them or because they were never presented to him in completed form—he knew that the representations made in those documents were being used to secure financing. *Financial Pacific Leasing, LLC v. Kilaru (In re Kilaru)*, 552 B.R. 806, 815-16 (Bankr. N.D. Ill. 2016). And for the purchase order specifically, the Debtor was aware of Mr. Stroup's concerns that it appeared to have been "cut and paste" or "doctored" but instructed him to submit it anyway. The Debtor's failure to review or inquire as to what was being submitted on his behalf showed his utter disregard and indifference for the accuracy of information he knew would play a pivotal role in his being approved for the loan.

Although executed after the fact, the Debtor's state court affidavit regarding the existence and location of the fake equipment embodied the same hallmarks of fraudulent intent. When the Debtor signed the affidavit stating that the nonexistent collateral was in the possession of Beard Implement, he was aware that his loans were in default and that Farm Credit was pursuing its rights against him and the collateral. By signing the affidavit under penalty of perjury, the Debtor either knew the truth and lied or should have known the truth but, in reckless disregard for the truth, did not bother to verify the accuracy of information to which he was attesting. As stated above, the Court does not believe that the Debtor was clueless about the representations being made to Farm Credit in seeking and obtaining the January 2018 loan. That neither Kyle

Schumacher nor Michael Stroup was involved in preparing the affidavit casts further doubt on the Debtor's efforts to portray himself as a hapless victim. But again, even if the Debtor was truly ignorant of the representations being made, his ignorance was willful and showed a reckless disregard for the accuracy of information that he clearly understood to be key to his loan approval.

Because the January 2018 loan was obtained using written statements regarding the Debtor's financial condition that the Debtor caused to be made and Farm Credit reasonably relied upon in making the loan, the debt from the January 2018 loan will be excepted from the Debtor's discharge. The Debtor scheduled the debt to Farm Credit as disputed, but Farm Credit filed a proof of claim to which the Debtor did not object. The claim included a summary breaking down the portions of the claim attributable to the January 2018 loan, including interest, late fees, and attorney fees and costs. The Debtor agreed that the loan agreement provided for payment of Farm Credit's legal fees. Exceptions to discharge under §523(a)(2) include any liability arising from the debt obtained by the means prescribed under the statute. *Kilaru*, 552 B.R. at 816-17 (extending the holding of *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998), which dealt with §523(a)(2)(A), to exceptions to discharge under §523(a)(2)(B)); *Dancor Const., Inc. v. Haskell (In re Haskell)*, 475 B.R. 911, 923 (Bankr. C.D. Ill. 2012) (Perkins, J.) (noting that attorney fees contemplated by contract could also be excepted from discharge). The entirety of the debt arising from the January 2018 loan will therefore be excepted from the Debtor's discharge.[6]

---

[6] Farm Credit did not seek a money judgment as part of the relief sought, so no money judgment will be entered.

### ii.    The February 2019 Loan

Although Farm Credit met its burden of establishing the elements of §523(a)(2)(B) as to the January 2018 loan such that the debt will be excepted from the Debtor's discharge, the same does not necessarily result in a determination that the February 2019 loan debt should be excepted from the Debtor's discharge. Each debt arose from a distinct transaction and must independently meet the requirements under §523(a)(2)(B).

The only false statements that Farm Credit asserted in support of its dischargeability claims against the Debtor were those made in the Debtor's loan application, balance sheet, and purchase order relating to the existence and ownership of equipment that was to serve as collateral for the January 2018 loan. The burden was on Farm Credit to establish those false statements were also used by the Debtor to obtain and reasonably relied on by Farm Credit in making the February 2019 loan. *See Ford Motor Credit Company, LLC v. Fleckenstein (In re Fleckenstein)*, 2017 WL 835160, at *4-6 (Bankr. C.D. Ill. Mar. 2, 2017) (absent evidence of debtors' adoption and creditor's actual and reasonable reliance, inaccuracies in credit applications generated by creditor using obviously outdated information from prior applications and transactions with same debtors did not meet requirements of §523(a)(2)(B)); *Westbank v. Grossman (In re Grossman),* 174 B.R. 972, 978, 983-86 (Bankr. N.D. Ill. 1994) (financial statement given in connection with earlier loan not applicable to second loan absent evidence that the debtor used it to obtain second loan and

plaintiff reasonably relied on it in making second loan). Farm Credit failed to meet its burden.

According to Farm Credit, it would not have made the February 2019 loan had it known that the information relied upon in making the January 2018 loan was inaccurate. Farm Credit's assertion is not surprising, of course, as it was made with the benefit of hindsight. But no evidence was presented of Farm Credit's review or decision-making process or that it specifically considered the Debtor's past written statements in making the February 2019 loan. The Debtor was not asked to renew or affirm the accuracy of the assertions made in the documents previously provided in support of his prior loan request, and the February 2019 loan and security agreements did not specifically refer to the collateral for the earlier loan. Ms. Archer did note the inclusion of a cross-collateralization provision as part of the February 2019 loan transaction but did not say that the provision was specifically relied on in making the second loan. To the contrary, all the evidence suggested that the second loan was made based on the value of the collateral offered for that loan. As part of the transaction, the Debtor was required to make a small cash payment to bring the loan-to-value calculation into balance and that calculation was based solely on the collateral pledged for the February 2019 loan. If Farm Credit was relying on any perceived equity in the January 2018 loan collateral in making the February 2019 loan, that equity should have received at least a passing reference in the loan-to-value calculation, but neither Mr. Stroup nor Ms. Archer testified that it did.

Even if Farm Credit in fact relied on the Debtor's past statements in making the February 2019 loan, it failed to present any evidence of the reasonableness of its reliance or the materiality of the Debtor's statements in the context of the second loan transaction. The statements submitted in connection with the Debtor's January 2018 loan approval clearly related to the Debtor's financial condition at that time and, more specifically, purported assets the Debtor was offering as collateral for that loan. Ms. Archer testified that Farm Credit would not extend a loan without collateral, which it had for the February 2019 loan. The evidence, including the testimony of Ms. Archer, did not suggest that the January 2018 loan transaction—along with the collateral that was to secure it—was a condition precedent to Farm Credit extending the February 2019 loan. *See Bogstad*, 779 F.2d at 375.

That begs further questions about the Debtor's intent and whether he used his prior false statements to obtain the February 2019 loan. There appears to be little dispute that the February 2019 loan was negotiated by Mr. Stroup for the purpose of paying down debt to Prairieland. As part of the transaction, Prairieland executed a subordination agreement that gave Farm Credit a first priority lien in certain equipment of the Debtor that Prairieland held as collateral. Ms. Archer agreed that the Debtor did not appear to be involved in the loan negotiations or discussions and that the proceeds for the February 2019 loan were paid directly to Prairieland rather than the Debtor. The note and security agreement bore the Debtor's signature. But none of the evidence supports Farm Credit's contention that the Debtor obtained the February 2019 loan by deceit

using the loan application, balance sheet, or purchase order from the January 2018 loan. *See Fleckenstein*, 2017 WL 835160, at *6.

Farm Credit failed to meet its burden of establishing that the February 2019 loan debt should be excepted from the Debtor's discharge under §523(a)(2)(B). Although it was established that the Debtor made false statements on his loan application, balance sheet, and purchase order submitted for the January 2018 loan, Farm Credit's evidence fell short of connecting those statements to the February 2019 loan. The February 2019 loan debt will therefore not be excepted from the Debtor's discharge under §523(a)(2)(B).

## B. Section 523(a)(6)

Debts for willful and malicious injury by a debtor to an entity or the property of an entity may be excepted from discharge. 11 U.S.C. §523(a)(6). A creditor claiming that a debt is nondischargeable under §523(a)(6) must prove three elements: (1) injury caused by the debtor, (2) willfulness, and (3) malice. *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) (citations omitted). In construing the statute, "willful" modifies "injury" and requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Actions are willful when both the act and the resulting injury are intended. *Id.* at 61-62. Willfulness can be established by demonstrating either a debtor's motive to inflict injury or that the debtor knew his act was substantially certain to cause injury. *First Weber Group*, 738 F.3d at 774 (citing *Bukowski v. Patel*, 266 B.R. 838, 843-44

-47-

(E.D. Wis. 2001)); *Chuipek v. Gilmore (In re Gilmore)*, 590 B.R. 819, 835 (Bankr. N.D. Ill. 2018). Actions are malicious if they are taken without just cause or excuse or in conscious disregard of one's duties. *First Weber Group*, 738 F.3d at 774 (citation omitted).

According to Farm Credit, the Debtor inflicted a willful and malicious injury on it and its money by obtaining loans through false representations about his financial condition. For the reasons set forth below, Farm Credit failed to establish its entitlement to relief under §523(a)(6).

Fraud is an intentional tort and therefore could support a claim under §523(a)(6). *Groom v. Krook (In re Krook)*, 615 B.R. 479, 487 (Bankr. N.D. Ill. 2020). But not all intentional torts meet the willful and malicious standard of §523(a)(6). *United Providers, Inc. v. Pagan (In re Pagan)*, 564 B.R. 324, 326-28 (Bankr. N.D. Ill. 2017) (discussing *Geiger* and collecting cases from the Seventh Circuit concluding that, while an intentional tort may meet the standard, not all intentional torts will). For many years, the various discharge exceptions of §523 were interpreted in the Seventh Circuit as being mutually exclusive. *Krook*, 615 B.R. at 487-88 (citing cases); *see also Attorneys' Title Guaranty Fund, Inc. v. Wolf (In re Wolf)*, 519 B.R. 228, 249 (Bankr. N.D. Ill. 2014). The Supreme Court's decision in *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 363-64 (2016), however, opened the door to debts being excepted from discharge under more than one provision of §523. Acknowledging both the inevitable overlap and meaningful distinctions between exceptions to discharge, the Court explained that it is possible that conduct falling within §523(a)(2) could also meet the requirements

of §523(a)(6). *Id.* Of course, the creditor seeking to except its debt from a debtor's discharge has the burden of establishing the elements of each of its claims by a preponderance of the evidence. *Grogan*, 498 U.S. at 287-88.

Here, Farm Credit established that the Debtor obtained the January 2018 loan using false written statements about the existence of equipment that was to serve as collateral for the loan such that the related debt will be excepted from his discharge under §523(a)(2)(B). And the Debtor undoubtedly acted intentionally when he made the false statements. But, again, an intentional act is "willful" for purposes of §523(a)(6) only if the resulting injury is also intended. *Geiger*, 523 U.S. at 61-62.

Farm Credit presented no evidence of the Debtor's subjective intent to injure Farm Credit or its property. To the contrary, the testimony painted a picture of the Debtor intent on keeping his farming operation afloat and in desperate need of financing to pay cash rents and other expenses to meet that end. With years of experience in the farm industry, the Debtor surely understood that the survival of his business depended not only on his being able to obtain loans but also on his repaying them. Farm Credit gave the Court no reason to believe that the Debtor intended anything other than to keep the wheels of his farming operation turning so that he might generate a profit from which he could repay his debts to Farm Credit. Indeed, the Debtor made the first installment payment on the January 2018 loan before a default was declared due to nonpayment of the February 2019 loan. No evidence was presented that the Debtor harbored any ill will toward Farm Credit or that he intended to inflict

-49-

harm on it. To the contrary, the Debtor apparently had never even dealt with Farm Credit before Mr. Stroup suggested that he apply for the January 2018 loan.

Nor did Farm Credit present evidence to support a finding that the Debtor knew his actions—in making false statements or otherwise—were substantially certain to cause injury. No doubt, the false statements about the existence of equipment left Farm Credit vulnerable in the event of nonpayment of the January 2018 loan. The same cannot be said, of course, about the February 2019 loan, which was secured by other equipment that in fact existed. Certainly, the injury suffered in relation to the February 2019 loan was caused by the Debtor's nonpayment, which, even if intentional, is not sufficient to except a debt from discharge under §523(a)(6) in the Seventh Circuit. *Taylor v. Snyder (In re Snyder)*, 542 B.R. 429, 438-442 (Bankr. N.D. Ill. 2015) (analyzing the Supreme Court and Seventh Circuit's comments about breach of contract as willful and malicious injury in *Geiger*, 523 U.S. at 62, and *First Weber Group*, 738 F.3d at 773). Farm Credit failed to show that the Debtor's false statements made in connection with the January 2018 loan evidenced the Debtor's intent to harm Farm Credit. If the evidence here were sufficient not only to except the debt for the January 2018 loan from the Debtor's discharge but also to except both Farm Credit loans from discharge based on willful and malicious injury, then every finding under §523(a)(2)(B) would also result in a finding under §523(a)(6). That is not the state of the law; more is needed to establish an exception to discharge under §523(a)(6), but the needed evidence was not presented here.

Because Farm Credit failed to present evidence that the Debtor intended injury or knew injury was substantially certain to occur from his actions, it cannot establish that the debts owed to it were incurred due to willful and malicious injury. The Debtor is entitled to judgment in his favor on the cause of action brought under §523(a)(6).

### IV.   Conclusion

The Debtor made false statements relating to his financial condition in several documents that he used to obtain a loan from Farm Credit in January 2018. He made those statements or caused them to be made with intent to deceive Farm Credit, and Farm Credit reasonably relied on the Debtor's statements in making the January 2018 loan. The resulting debt therefore will be excepted from the Debtor's discharge. Farm Credit, however, failed to establish a connection between the Debtor's false statements and the February 2019 loan, and it failed to establish that either loan debt was incurred due to willful and malicious injury caused by the Debtor. Judgment will therefore be entered in favor of Farm Credit on Count II only to the extent of the January 2018 loan debt and in favor of the Debtor in all other respects.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###